-1-

Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Ave, 7th Floor
New York, New York 10177
Phone: (212) 300-5358
Fax: (888) 265-7054

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

POSEIDON WAVE MEDIA LLC,                      Case No.: 26-cv-3921

                          Plaintiff,          **ECF CASE**

              v.                              **AMENDED COMPLAINT AND JURY
                                              DEMAND FOR DAMAGES FOR
                                              COPYRIGHT INFRINGEMENT**

SUNO, INC.,

                          Defendant.
-----------------------------------------------------------------x

1.      Plaintiff POSEIDON WAVE MEDIA LLC, by and through the undersigned

counsel, brings this Amended Complaint and Jury Demand against defendant SUNO, INC. for

damages based on copyright infringement and related claims pursuant to the Copyright Act and

Copyright Revisions Act, 17 U.S.C. §§ 101, et seq. ("the Copyright Act" or "Act"), the Uniform

Trade Secret Act - N.Y. CLS Labor Law § 201-e, and the Defend Trade Secrets Act 18 U.S. Code

§ 183 et seq.  Plaintiff alleges below, upon personal knowledge as to itself, and upon information

and belief as to other matters so indicated.

**NATURE OF THE ACTION**

2.      This case concerns defendant Suno Inc.'s ("Suno") generative AI service, which

allows users to generate digital music files in response to basic inputs.  The capacity for a

generative AI service, like defendant's, to produce convincing imitations of genuine sound

recordings starts with copying a vast range of sound recordings, including those owned by plaintiff.  Defendant's service "ingested" the unlawfully reproduced recordings, including plaintiff's copyrighted recordings at issue here, and used them to train its generative AI service.

3.     That musical files produced from defendant's generative AI service have resulted in a market saturated with machine-generated content that has directly competed with, cheapened, and ultimately drowned out the genuine sound recordings, like plaintiff's, on which defendant's service was built.

4.     It is axiomatic that copyright law protected sound recordings for the purpose of developing an AI product without the permission from rightsholders like plaintiff prior to reproduction.  That did not happen; instead, defendant scraped musical content, like plaintiff's, from a myriad of sources and created a vehicle that has eroded the value of the artistic works that comprise the essential raw materials that allow them to function in the first place.  If left unmoored from established and longstanding legal constraints, such products will supplant, rather than support, genuine human creativity.  This is not hyperbole, but a reflection of what has already happened, and will continue to expand, in the modern music marketplace.

5.     The two, and only, members of plaintiff are individual artists who have developed an identifiable sound consisting of complex layers of music woven together and refined.  The decades it has taken to for plaintiff to develop and refine their process and methods of music creation, and the weeks to months spent by plaintiff in developing each single original musical piece, has been co-opted by defendant and used to supplant plaintiff's original musical works in the marketplace.

6.    Suno charges many of its users' monthly fees to use its product and produce digital music files, which are designed to entertain, evoke emotion, and stoke passion just like the genuine sound recordings Suno copied.

7.    Of course, it is obvious that Suno's service is trained on copyrighted music like plaintiff's recordings and compositions at issue here.  Suno's product can only work the way it does by copying vast quantities of sound recordings from artists across every genre, style, and era.  If Suno had taken the effort to avoid copying songs like plaintiff's sound recordings and ingesting them into its AI model, Suno's service would not be able to reproduce the convincing imitations of such a vast range of human musical expression at the quality that Suno touts.  Suno's service trains on the expressive features of these copyrighted sound recordings for the ultimate purpose of poaching the listeners, fans, and potential licensees of the sound recordings it copied.

8.    Plaintiff tested Suno's product and generated outputs using a series of prompts that pinpoint a particular sound recording by referencing specific copyrighted recordings owned by plaintiff.  Each musical file generated by Suno's AI service closely matched the targeted copyrighted sound recordings, which can only mean that Suno copied plaintiff's copyrighted sound recordings to include in its training data.

9.    For two decades, the members of plaintiff, have created, modified, and refined its confidential and proprietary methods and processes to create a unique system of layering numerous independent layers of music, which are then woven together like pieces to a puzzle.  Plaintiff also created confidential and proprietary methods and processes employed to acquired create unique sounds that cannot be reverse engineered.

10.    Suno has not merely impermissibly reproduced plaintiff's copyrighted sound recordings and ingested them into its system, it has impermissibly co-opted and employed plaintiff's confidential methods and process to create new music files.  Decades of experimentation, at an incredible expense of both time and finances, have been impermissibly ingested, analyzed, and employed by defendant.  Suno has impermissibly obtained the very trade-secrets plaintiff has diligently protected from disclosure.

11.    In fact, plaintiff would not have granted Suno a license, had it sought one, because that would entail exposure to the very impermissible reverse-engineering of plaintiff's confidential processes and methods; which is exactly what happened.

12.    Suno's unauthorized copying erodes the value and integrity of plaintiff's copyrighted sound recordings with rapid and devastating impact.  Suno's service generates music with such speed and scale that it risks overrunning the market with AI-generated music and generally devaluing and substituting for human-created work.  Suno already has over 100,000,000 users generating an estimated 7,000,000 new music files every day.  These digital music files have been released to the public—some already finding their way onto the major streaming services—and compete with the copyrighted sound recordings that enabled their creation; yet Suno sought no permission from and gives no credit or compensation to the human artists or other rightsholders whose works fueled their creation.

13.    Suno also profits substantially from its infringement of plaintiff's copyrighted sound recordings, and those of other artists.  In November 2025, Suno raised $250 million in Series C funding reaching a $2.45 billion valuation.  Suno further touts a roster of high-profile backers and has monetized its service, charging users up to $24 per month for its highest

subscription tier.  None of that would be possible without the vast troves of copyrighted sound recordings, including plaintiff's, that Suno copied to train its AI model.

14.     Suno cannot avoid liability for its willful copyright infringement by claiming fair use. The doctrine of fair use promotes human expression by permitting the unlicensed use of copyrighted works in certain, limited circumstances, but Suno offers imitative machine-generated music—not human creativity or expression.  Moreover, the Copyright Act enumerates four factors to assess whether an unauthorized use is fair, none of which favors Suno's product. These factors are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  In these circumstances, the purpose of Suno's use of plaintiff' copyrighted sound recordings is quintessentially commercial and creates directly competitive digital music files that serve the same purpose as the recorded music plaintiff create and substitute for genuine recordings by humans; Suno copies the key expressive features of plaintiff's copyrighted sound recordings, and those of other artists; those copyrighted sound recordings are at the core of copyright protection; and Suno's infringement undermines both existing and potential commercial markets for selling, licensing, and distributing sound recordings.  If left unchecked, Suno risks upending whole segments of the legitimate music industry.

15.     At its core, this case is about ensuring that copyright continues to incentivize human invention and imagination, as it has for centuries, and to protect companies like defendant from impermissibly obtaining and reverse engineering the trade-secrets employed to create the copyrighted works.  Achieving this end does not require stunting technological innovation, but it

does require that Suno adhere to copyright law and respect the creators whose works allow it to function in the first place.

16.     Plaintiff brings this action seeking an injunction and damages commensurate with the scope of Suno's massive and ongoing infringement.  These claims are not new to Suno. Plaintiff is just one of many copyright holders that has fallen victim to Suno's blatant disregard for U.S. copyright law.  This action follows others that have already shed light on Suno's pervasive infringements.  Plaintiff seeks to rectify the damage Suno has done to plaintiff's rights.

## JURISDICTION

17.     This is a civil action seeking damages and injunctive relief for infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*.  As such, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

18.     Plaintiff is the sole owner of all rights to the two hundred and thirty-six (236) musical recordings and compositions covered by the one hundred and sixty-four (164) U.S. Copyright Registrations identified in Exhibit A annexed hereto (the "Copyrighted Tracks").

19.     Defendant Suno, Inc. is a Delaware corporation with a hybrid structure of headquarters split between New York City and Cambridge, Massachusetts.

20.     Defendant was put on notice of its infringing activity, but elected to continue to infringe after notice.

21.     Plaintiff suffered a particularized injury in this Judicial District from the intentional torts of defendant in this Judicial District as described below.

22.     Defendant was put on notice that their infringing activity was having consequences in this state.

23. Defendant elected to continue to infringe, knowing its actions would have consequences in this state.

24. Jurisdiction is conferred to this Court over defendant pursuant to CPLR § 302(a)(3)(i) and (ii).

**VENUE**

25. At bar, a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District and venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1)-(3).

**DUE PROCESS**

26. There are no due process concerns in light of the fact that defendant committed an intentional tort, knowing its action would have an impact in this Judicial District, and defendant maintains a headquarters in New York City.

**THE PARTIES**

27. Plaintiff POSEIDON WAVE MEDIA LLC ("POSEIDON") is a limited liability company existing and organized under the laws of the State of Wyoming with a headquarters located at 75-10 197th St, 1st Floor, Flushing, NY 11366.

28. SUNO, INC. ("SUNO") is a corporation formed under the laws of Delaware with its principal place of business located at 242 W 38th St, New York, NY 10018.

**FACTUAL BACKGROUND**

29. Plaintiff owns and exercises exclusive control over copyrights and/or exclusive rights under federal law in and to two hundred and thirty-six (236) sound recordings and compositions (the "Copyrighted Tracks"). Exhibit A, attached hereto and incorporated herein by

reference, are the one hundred and sixty-four (164) U.S. Copyright Registrations Suno is alleged to have infringed.  The members of plaintiff have assigned all of their rights to the Copyrighted Tracks, as well as the rights to the trade secret methods and process employed to create the Copyrighted Tracks, to plaintiff.

30.     The two, and only, members of plaintiff are John Emanuele ("Emanuele") and Richard Cupolo ("Cupolo"), who are highly skilled musicians, each playing numerous musical instruments.  Messrs. Emanuele and Cupolo met in high school and formed the band "The American Dollar" in 2005 while they were in college.  For more than two decades, Emanuele and Cupolo have developed their own unique approach to cinematic and ambient instrumental music.  Through decades of constant experimentation and refinement, Cupolo and Emanuele have developed confidential and proprietary methods and processes of creating, and weaving together, numerous independent layers of music consisting of various instruments and sounds into a rich texture that is readily identifiable as "The American Dollar sound".

31.     It takes up to several months for Emanuele and Cupolo to develop a single song; endlessly refining the musical layers of each musical composition and recording.  In more than two decades of constant work, Emanuele and Cupolo have composed two hundred and thirty-six (236) songs which are the Copyrighted Tracks at issue here.

32.     Since approximately 2009, the two members of plaintiff have made a living from the revenue generated primarily from licensing and streaming the Copyrighted Tracks and compositions they created.   For almost twenty (20) years, licensing was the largest source of this revenue.  Defendant's Suno AI product, however, has acted as a major disrupter in the sector, and

plaintiff's licensing revenue has been nearly eliminated since the first version of Suno AI was made available to the public.

33.     The Copyrighted Tracks at issue here consist solely of cinematic and ambient recordings with no lyrics.  The ambient Copyrighted Tracks are comprised of textured layers of more ethereal sounds with little to no percussion.  The cinematic Copyrighted Tracks have a richer texture of layered sound with at times driving percussion and guitar creating a more orchestral feel.

34.     As purely instrumental recordings, the Copyrighted Tracks are ideal for licensing. It also makes the Copyrighted Tracks ideal for ingestion into defendant's AI system and then used by defendant as the basis to create similar recordings based on the Copyrighted Tracks as there are no identifiable lyrics or singer on any of the Copyrighted Tracks.

35.     Plaintiff's Copyrighted Tracks are in the top 1% on music streaming services, like Spotify, and they have been licensed by scores of the largest companies and organization in the world.  For example, plaintiff's Copyrighted Tracks have been licensed by: (i) Warner Brothers for a major motion picture, (ii) Activision for its Spiderman II video game, and national advertising campaigns for companies like (iii) Yeti Coolers, (iv) DC Shoes, (v) Colgate, (vi) Apple, (vii) PBS, (viii) MLB Network, (ix) SONY, (x) the American Heart Association, as well as scores of other major organizations and brands.

36.     Plaintiff's Copyrighted Tracks have also been licensed for use in scores of television programs including, but not limited to: (i) Keeping Up with Kardasians (E Network), (ii) CSI Miami (CBS Television), (iii) 16 and Pregnant (MTV), (iv) The Real World (MTV), (v) NIKE Battlegrounds (MTV), (vi) Alaska the Last Frontier (Discovery), (vii) Bad Girls Club

(Oxygen), (viii) 30 for 30 (ESPN), Human Planet (discovery, (ix) The Vineyard (ABC Family), and (x) World of Adventure Sports (NBC).

37.    The licenses issued by plaintiff to major companies for use in national advertising campaigns, video games, movies, television, etc., also plays a pivotal role in marketing the Copyright Tracks and increasing revenue from streaming sources.

38.    The licensing revenue generated from the Copyrighted Tracks has been reduced by nearly 80% since Suno launched its service.  In fact, there is a clear line of demarcation in revenue fall-off dated from the public launch of Suno's AI service.

## DEFENDANT SUNO

39.    In July 2023, a group of individuals who collaborated at Kensho Technologies, an AI solutions business, launched a "beta" version of Suno's AI music generation service.  Suno's stated vision is to "build[ ] a future where anyone can make great music.  Whether you're a shower singer or a charting artist, [Suno] break[s] barriers between you and the song you dream of making."[1]

40.    Suno initially engaged users to generate AI music files through its channel on the social media website Discord, and later rolled out a web interface to expand the reach of its music generation product.  In December 2023, Suno announced a strategic partnership with Microsoft by which Suno's service would be integrated into Microsoft's AI chatbot Copilot.

41.    Whether using Suno's website interface or Microsoft's Copilot, Suno's service allows users to enter text prompts to generate digital music files.  Users can prompt Suno's service with a description of the music they want to generate, which can include specifying the genre, lyrics, story direction, and themes to serve as inspiration.  Within seconds, Suno's service

---

[1] Suno, About, https://suno.com/about.

processes the user's prompt and generates a digital music file (Suno's website generates two files per prompt, whereas Copilot's Suno plug-in generates one). Suno's customization options then allow users to adjust elements of the files, including tempo, mood, and genre.

42. In the early versions of the Suno AI service, plaintiff (or any user) could prompt the Suno AI to create recordings that sound like specific Copyrighted Tracks as performed by the band The American Dollar. As discussed in detail below, this is exactly what plaintiff did; prompting Suno AI to create musical files that could be downloaded in MP3 format that closely mimic the essential elements of the targeted Copyrighted Tracks.

43. Suno offers both free and paid versions of its product. Under the free plan, users are given 50 credits per day, equivalent to 10 music files. According to Suno's terms of service, free users cannot use the files they generate for commercial purposes. Users can subscribe to the Pro and Premier plans for monthly fees of $8 and $24, respectively. The Pro plan gives users 2,500 credits per day, enough for 500 music files, while the Premier plan comes with 10,000 credits per day, enough for 2,000 music files. Under either paid subscription, Suno allows users to utilize their digital music files for commercial purposes, such as by uploading them to YouTube or music streaming services like Spotify or Apple Music. With this model, Suno earns revenue by encouraging users to generate digital music files and exploit them commercially. Put simply, the more digital music files Suno's service produces for its users, the more Suno charges.

44. On March 21, 2024, Suno launched a new version of its service, dubbed "v3," which it describes as its "first model capable of producing radio-quality music." Version 3 enables all users, free or paid, to generate digital music files up to two minutes in length virtually instantaneously.

-11-

45.     On May 30, 2024, Suno launched yet another version of its service, named "v3.5," which it describes as an updated version of v3.  Version 3.5 enables all users, free or paid, to generate digital music files up to four minutes in length virtually instantaneously.  Suno has announced that its next version, "v4," is already in development and promises to continue "improving along the axes of quality, control, and speed."

## Suno Trains its AI Using Copyrighted Tracks

46.     The Suno AI model was developed to have the flexibly to perform tasks that are typically expected to require human intelligence to achieve.  "Generative AI" is a kind of AI aimed at producing content such as text, images, or (in Suno's case) audio.  The generative AI models like Suno's, are based on machine learning models.  These models do not employ preset rules for generating outputs, but rather deduce patterns from a large corpus of training content. They store these patterns as billions of numerical parameters.  In aggregate, these parameters constitute the model.  The training process adjusts the parameters so that the model produces content that is based on the content on which the model is trained.

47.     Upon information and belief, and consistent with the basic facts of how generative AI works, the content Suno used to "train" its AI model includes plaintiff's Copyrighted Tracks which were reproduced by Suno without license or permission from plaintiff.   Suno, in fact, could not have built a model capable of producing audio so similar to the Copyrighted Tracks without the initial act of reproducing the Copyrighted Tracks.  This explains why one of Suno's investors has publicly recognized that Suno's service is likely to spawn litigation and that

-12-

defending lawsuits from music labels is "the risk we had to underwrite when we invested in the company."[2]

48.    Given that the foundation of its business has been to exploit copyrighted sound recordings without permission, Suno has been deliberately evasive about what exactly it has copied.  For example, one of Suno's co-founders posted online that Suno's service trains on a "mix of proprietary and public data."[3]  Suno's executives have admitted to the forgoing but claims its practices are "fairly in line with what other people are doing."[4]  An early investor admitted that "if [Suno] had deals with labels when this company got started, I probably wouldn't have invested in it. I think that they needed to make this product without the constraints."[5]

49.    On information and belief, similar to other generative AI audio models, Suno trains its AI model to produce audio output by generally taking the following steps:

   a.   Suno first copies massive numbers of sound recordings, including by "scraping" (*i.e.*, copying or downloading) them from digital sources. This vast collection of information forms the input, or "corpus," upon which the Suno AI model is trained.

   b.   Suno then "cleans" the copied recordings to remove any material, whether technical or substantive, that it does not wish to include in its AI model (for instance, duplicate or low-quality data).  This step may also involve copying the recordings to convert them into a common digital audio format.

   c.   Suno then processes this corpus of previously copied recordings to establish the values of the parameters that form its AI model.  This step

---

[2] Brian Hiatt, A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything, Rolling Stone (Mar. 17, 2024), https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/.
[3] @georg, Discord, Suno-General (Aug. 3, 2023).
[4] Rachel Metz, The AI Music Era Is Here.  Not Everyone Is a Fan, Bloomberg (May 6, 2024), https://www.bloomberg.com/news/articles/2024-05-06/suno-udio-and-more-the-ai-music-era-is-here-not-everyone-is-a-fan.
[5] Hiatt, supra.

includes additional copying of the ingested recordings, including into computer memory, as they are further converted and divided into units, and as those units are processed.

d.  Suno next processes the data further to "finetune" its AI model, which may require additional copying of the collected sound Tracks.

50.    After undergoing this training process, Suno's service gains the capacity to generate audio output based on Suno's model, which, as just described, is a product of the corpus of sound recordings on which it was trained.   When a user prompts Suno's service with a text input (*e.g.*, create a song that sounds like [one of the Copyrighted Tracks]), the service generates an audio output by making generalizations about what the audio output should sound like based on the prompt and the corpus of sound recordings on which it was trained.  Certain features of the outputs from Suno's model betray that it was trained on particular data—in this case, the Copyrighted Tracks.

51.    In particular, Suno's product frequently generates outputs with more than a strong resemblance to the Copyrighted Track in the query.  This is a telltale sign that such Copyrighted Tracks were included in Suno AI's training data.  The Suno AI generated music files not only resemble the musical elements of the original compositions, they recreate their distinctive emotional character, including a nostalgic and wistful tone.   This emotional effect is not incidental; it arises from the use of the same underlying systems of timing, spacing, layering, production, and development that define plaintiff's original Copyrighted Tracks.  As a result, the Suno AI outputs reproduce both the structural design and the resulting expressive impact of the original Copyrighted Tracks.

52.    In technical terms, by generating outputs that mimic sound recordings in its training corpus, Suno's model reflects the machine-learning phenomenon known as "overfitting." An AI model is "overfitted" when it is too closely adapted to the data on which it was trained, making it difficult for the model to generalize to new data sets.  One symptom of overfitting is a model that replicates portions of its training data. To take a simplified example, if a user inputs the prompt "an ambient song" into an overfitted AI model, the model may output a file that

closely resembles the musical elements of the many ambient tracks on which it trained.

53.    As in the examples discussed below reflect, Suno's model obviously was trained on the Copyrighted Tracks.  The examples of the Suno generated music files discussed below mimic the systems of timing, spacing, layering, production, and development that define the original works.   Elements that plaintiff has spent decades refining.  As a result, the Suno AI outputs reproduce not just the structural design but the resulting expressive impact of the original Copyrighted Track.

54.    This infringement cannot be cured by simply loosening the model's fit or by implementing technical guardrails that make it less likely that outputs will match excerpts of the Copyrighted Tracks.  In other words, modifying Suno's offering in a way that better conceals its training data would not alter the fact that Suno infringed plaintiff's rights to the Copyrighted Tracks the moment it reproduced and ingested them to create its model.

55.    One of Suno's earliest investors has all but admitted that Suno's service trains on sound Tracks like the Copyrighted Tracks at issue here.   Antonio Rodriguez, a partner at the venture capital firm Matrix Partners, explained that his firm invested in the company with full knowledge that Suno might get sued by copyright owners, which he understood as "the risk we had to underwrite when we invested in the company."[6]   Rodriguez pulled the curtain back further when he added that "honestly, if we had deals with labels when this company got started, I probably wouldn't have invested in it.  I think they needed to make this product without the constraints."[7]

56.    By "constraints," Rodriguez was, of course, referring to the need to adhere to ordinary copyright rules and seek permission from rightsholders to copy and use their works. Rodriguez's message was clear: he was willing to "underwrite" the costs of the lawsuits relating to Suno's large-scale intellectual property theft because he expected his investment in Suno to be accretive despite the damages owed to copyright owners.

---

[6] Id.
[7] Id.

57. Suno's unlawful copying of the Copyrighted Tracks into its training data has not been lost on even casual users of Suno's product. Indeed, many observers have drawn this obvious conclusion, expressing alarm over the scope of Suno's unauthorized copying. To provide just a sample:

- "Though neither company will directly confirm or deny it, there is substantial reason to believe that . . . Suno . . . w[as] trained on copyrighted music, without permission[.]" Brian Hiatt, *AI-Music Arms Race: Meet Udio, the Other ChatGPT for Music*, Rolling Stone (Apr. 10, 2024).
- "While details about the data that trained these AI tools are sparse, there is plenty of reason to believe that they are trained on copyrighted music." Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024).
- "Although Suno hasn't revealed what music has been used to train its music-generation models, it seems almost certain that the startup has used materials without the explicit consent of their creators. For one thing, many of its musical outputs are somewhat similar to popular songs." Mike Wheatley, *Generative AI Music Maker Startup Suno Raises $125M in Funding*, SiliconAngle (May 21, 2024).
- "To create music as convincing as some of the examples generated by Suno and other platforms using AI algorithms means training those algorithms on existing music, and lots of it. And that's where copyright comes into play, because it's become plainly obvious that many AI models have been built by ingesting enormous quantities of copyrighted material." Daniel Tencer, *Suno Could Get Sued By The Record Business. Who's Backing it With $125M?*, Music Business Worldwide (May 28, 2024).

58. Suno's AI product generates recordings that not only sound similar on the surface, but more importantly, follow the same timing, layering, textures, and overall structure of the Copyrighted Tracks that were created by plaintiff's members and are associated with The American Dollar sound. Each of the forgoing elements are not just generic elements of the genre, but the very heart of the sound plaintiff developed over decades of practice and refinement. When those same elements show up together, expressed in the same manner, it is

quite evident that plaintiff's Copyrighted Tracks were used as the basis for Suno's AI product.

59.    Defendant is not only benefiting from its impermissible reproduction and ingestion of the Copyrighted Tracks, but from its ingestion and reverse engineering of plaintiff's confidential and proprietary methods and processes employed in the creation of the Copyrighted Tracks.  Defendant has misappropriated the decades of time, and significant expense, expended in developing and refining those confidential methods and processes brought to bear when creating each of the Copyrighted Track.

**Suno's Outputs Confirm Copying and Ingestion of Plaintiff' Copyrighted Tracks**

60.    The fact that Suno's AI product generates digital music files that mimic readily identifiable features of the Copyrighted Tracks supports the conclusion that Suno is using the Copyrighted Tracks in training its AI model.  To be clear, plaintiff is not presently alleging that these outputs themselves infringe the Copyrighted Tracks unless discovery reveals that they directly or indirectly recapture portions of the Copyrighted Tracks.  These outputs confirm as an evidentiary matter that Suno has copied specific Copyrighted Tracks into its training data to build its service.

61.    From in or about June through September 2024, plaintiff tested defendant Suno's AI system.  The unquestionable conclusion of those tests is that the musical files generated by Suno contain the type of melodic and stylistic similarities to that can only be explained by the ingestion of plaintiff's Copyrighted Tracks into defendant's AI model.  As further explained below, those similarities betray that the model was trained on the Copyrighted Tracks.

62.    Specifically, plaintiff discovered that using targeted prompts that include the name of the Copyrighted Tracks, Suno AI generated music files with key musical elements that identical or highly similar to the Copyrighted Track used in the query.  Moreover, the analysis of the Suno AI music files generated from each prompt manifested the same layering structure, and certain unique sounds that can only be explained by defendant's impermissible access and reverse engineering of plaintiff's confidential methods and process.

-17-

63.    Plaintiff's testing of the Suno AI system was designed to demonstrate that plaintiff's Copyrighted Tracks were included in Suno's training data, since Suno has attempted to conceal the recordings on which it has trained.  The results confirm that Suno has copied and trained its AI system on the Copyrighted Tracks, based on the high degree of similarities between the Suno generated music files and the Copyrighted Tracks.  A degree of similarity that would be impossible if Suno was not training its AI system on the Copyrighted Tracks.

64.    As described below, the outputs from Suno's product share indisputable similarities with the Copyrighted Tracks, which is the obvious result of training on the Copyrighted Tracks.

**Methodology of the Analysis**

65.    Starting on or about June 26, 2024 through September 30, 2024, John Emanuel, one of the two managing members of plaintiff, and co-author of each of Copyrighted Tracks, conducted queries for thirty-two (32) of the Copyrighted Tracks on Suno AI.

66.     Each query of the Suno AI generally yielded two music files referred to here as ("v1") and ("v2").   In total, Suno AI generated sixty-four (64) music files in response to the thirty-two (32) queries.

67.    Plaintiff conducted an in-depth analysis of sixty-one (61) of the Suno AI music files that were generated.  For the Copyrighted Tracks titled "Bump", "Lights Tim", and "Time", plaintiff was only able to download and analyze only one of the two Suno AI files created from the associated query.

68.    Attached hereto as **Exhibit B** is a thumb drive with thirty-two (32) files.  Each files contains one the Copyrighted Track used in the testing, along with the associated Suno AI music file(s) created from the query.

69.    The methodology for creating the test Suno AI music files was as follows:
- Log into Suno.
- In the "Create" section of the Suno dashboard, Mr. Emanuele entered "Create a song that sounds like [Copyrighted Track] by the band the American dollar."

-18-

- The "Instrumental" button in the Suno interface was then engaged.
- The "Create" button on the Suno interface was then engaged.
- Suno returned two instrumental music files that could be played in the Suno music player.
- The Suno created music files were then downloaded in the next window, which also displayed genre tags 'similar to The American Dollar Copyrighted Track' that Suno was attempting to mimic.
- The recording(s) generated by Suno were then downloaded in mp3 format.

### Analysis of the Suno Generated Recordings

70.    Below is the analysis of the recordings generated by Suno with the above methodology.  The terminology in the below analysis is predicated, in part, on the following definitions:

- **Phrasing** refers to the manner in which musical notes are grouped and shaped into expressive musical sentences.
- **Texture** refers to the manner in which different sounds and layers interact in a piece of music.
- **Cord progression** refers to a sequence of cords played in a piece of music.
- **The Pulse:** The basic unit of time that remains consistent throughout a song, similar to a ticking clock or heartbeat.
- **Rhythmic structure** refers to the overall layout of the pattern of the beats and timing in the musical recording.
- **Beat** is defined as the main accent or rhythmic stress in music representing the steady, underlying pulse of a piece. In a broader sense, it refers to a repeated, rhythmic movement or sound.
- **BPM** refers to beats per minute.
- **Temporal architecture** refers to how the overall layout of the speed and timing of the rhythms, patters, delays, and sections work together in a given piece of music.
- **Temporal spacing** refers to the time between individual notes or events in a given piece of music.
- **Delay** refers to an effect that repeats a sound after a short time creating an echo-like effect.

-19-

- **Groove** refers to the feel or swing of the rhythm of a piece of music.
- **Layering** refers to the process of adding multiple sounds or instruments in layers on top of each other.

## Example I

71.     One of the Copyrighted Tracks at issue here is titled "Age of Wonder" ("Copyrighted Track I"). Copyrighted Track I exhibits a highly regularized onset structure consistent with repeated subdivision patterns with a mean onset spacing of ~0.232 seconds. This corresponds to a consistent subdivision grid aligned with ~106 BPM. This produces a repeating, delay-compatible temporal lattice, particularly evident in evenly spaced note attacks and recurring 1/8 and 1/16 note subdivision intervals.

72.     Suno was queried with the prompt: "create a song that sounds like "Age of Wonder" by the band the American Dollar". This query was run in Suno AI v1 and v2.

73.     Suno AI created a recording with the strikingly similar title "Echoes of Wonder" in both v1 and v2.

**Similarities in Between the Suno AI v1 and v2 Recordings and Copyrighted Track I**

74.     Both of the SUNO AI v1 and v2 recordings replicate the fairly unique rhythmic structure, production, and delay-based temporal architecture of Copyrighted Track I as well as Copyright Track I's rhythmic architecture defined by repeated onset spacing and delay interaction. Specifically, both Suno AI recordings and Copyrighted Track I have the same or highly similar:

- repeated 1/8 and 1/16 note-driven melodic articulation,
- specific sequencing of instrumental roles and entry order;
- consistent spacing patterns aligned with the same temporal grid;
- use of delay-based repetition structures rather than free melodic phrasing;
- large, diffuse reverb on piano;

- kick emphasis at beginning and end of measure;
- sparse mid-measure density;
- a floating rhythmic feel;
- the specific rhythmic density pattern;
- medium delay on melodic elements;
- sequence of instrumental roles and entry order;
- ambient hiss/noise floor;
- similar depth layering; and
- the presence of hiss and identical reverb behavior indicates replication at the sound recording level.

75.    Further, the introductory structure of the Suno AI recordings mimic the same structure of Copyrighted Work I.  Namely, Copyrighted Track I and the two Suno AI music files contain the same or highly similar:

- low, foreboding synth/string layer;
- high, reverberant piano overlay;
- sustained sub-bass anchoring tonic across measures;
- high-frequency ambient pad layer;
- piano functioning as both melodic voice and delay-driven texture;
- melodic structure and delay-based phrasing system; and,
- the gradual spatial expansion.

76.    Even the fairly unusual structural sequencing of Copyrighted Track I is replicated by both of the Suno AI recordings; namely, Intro → layering → beat entry → break → reintroduction.

77.    The ending in Copyrighted Track I establishes a distinct delay-driven melodic pattern; which is a very uncommon feature.  Both v1 and v2 have the distinct same unique delay-driven melodic pattern.

**Individual Similarities of v1 and v2 to the Copyrighted Track**

78.    The Suno AI v1 recording uses the same 1/16 note repetition and a nearly identical temporal organization of melodic expression as Copyrighted Track I.

79.     The Suno AI v2 recording replicates the break and re-entry timing with delayed melody and rhythm.  The Suno AI v2 recording also replicates the break and re-entry timing with delayed melody and rhythm and specifically reproduces the delay phrasing behavior of the original's ending, maintaining the same time-offset repetition system.

80.     Clearly, the Suno AI product ingested Copyright Track I, and, when prompted, created two strikingly similar music files, with the same functional music elements as Copyrighted Track I, expressed in a highly similar manner.

81.     It is logically inferred from this evidence that all of plaintiff's Copyrighted Tracks were reproduced by Suno, utilized to train it's AI product, and the Copyrighted Track's essential core elements are being duplicated or mimicked by Suno to create musical files that mimic the elements of the original Copyrighted Tracks.

**Example II**

82.     One of the Copyrighted Tracks at issue here is titled "Anything You Synthesize" ("Copyrighted Track II"). Copyrighted Track II exhibits a stable rhythmic foundation at approximately 120 BPM with consistent subdivision structure with 1/8 and 1/16 note-based piano articulations, and consistent temporal spacing of melodic events.  Some of the musical elements of note in Copyrighted Track II are its introductory structure that includes: (i) sparse piano intro, (ii) subtle reverb on piano, and (iii) gradual addition of melodic piano layer with melodic structure that includes (i) piano melodies that begins in a higher register, (ii) melodies that resolve downward (from higher pitch to lower pitch), and (iii) use repeating rhythmic phrasing.

83.     Suno was queried with the prompt "create a song that sounds like "Anything You Synthesize" by the band the American Dollar".

84.    Suno created two recordings titled "Endless Sky", one in v1 and the second in v2.

**Similarities in Between the Suno AI v1 and v2 Recordings and Copyrighted Track II**

85.    The two Suno recordings contain the same (ii) rhythmic structure, (ii) temporal framework, (iii) rhythmic subdivision framework as Copyrighted Track II.  Specifically, both Suno AI recordings have the same or highly similar musical elements and composition as Copyrighted Track II including the following:

- 1/8 and 1/16 note-based piano articulation, and consistent temporal spacing;
- consistent temporal spacing;
- introductory structure that includes (i) sparse piano intro, (ii) subtle reverb on piano, and (iii) gradual addition of melodic piano layer;
- introductory piano-based architecture;
- rhythmic groove and percussion structure;
- beginning with light rhythmic elements, and a delay introduction of fuller percussion;
- a gradual rhythmic density buildup;
- harmonic and tonal structure;
- tonic-based spacing across measures and use slow harmonic pacing;
- harmonic anchoring approach;
- arrangement and sectional development;
- subtle piano reverb;
- spatial depth;
- introduction of reverbed background elements before transitions;
- melodic contour and phrasing system;
- consistent melodic contour and phrasing system;
- rhythmic subdivision;
- gradual buildup;
- production characteristics; and,
- melodic structure that includes (i) piano melodies that begins in a higher register, (ii) resolve downward, and (iii) use repeating rhythmic phrasing.

86.    The Suno AI recordings, in fact, mimic the very elements that made Copyrighted

Track II the most frequently licensed and streamed track in plaintiff's catalogue.

**Individual Similarities of v1 and v2 to the Copyrighted Track**

87.     The Suno AI v1 music file and the Copyrighted Track II have the same or highly

similar:

- introduction at an 1/8 note base piano pattern that progresses into a 1/16 note piano pattern,
- piano patterns;
- consistent production environment;
- piano-based development and resolution.

88.     The Suno AI v2 music file and Copyrighted Track II have the same or highly

similar:

- 16th note lead piano pattern;
- 1/4 note guitar synth accent pattern;
- piano intro;
- addition of melodic piano;
- introduction of guitar;
- break section;
- placement of accent events between measures using analogous sonic elements;
- reintroduction with fuller drums and melody;
- transition to a more energetic section;
- resolution into a featured piano line;
- sequence of the arrangement; and,
- complex drum elements.

89.      The Suno AI recordings recombine expressive elements from Copyrighted Track

II while maintaining their functional roles.  These similarities reflect reproduction of

Copyrighted Track II's selection, coordination, and arrangement of expressive elements.

**Example III**

90.     One of the Copyrighted Tracks at issue here is titled "Signaling Through the

-24-

Flames" ("Copyrighted Track III"). Some of the musical elements present in Copyrighted Track III are a consistent rhythmic structure with a steady tempo and repeating onset spacing patterns, along with a repeating lower delayed electric piano melody and a higher accent melody placed between measures. It has a lower delayed electric piano as the foundational melodic element; rhythmic accents and textural events including the higher piano accents placed between measures with reversed cymbal and reverbed guitar pad used as transitional accents as well as a reverbed strings present in the opening.

91. Suno was queried with the prompt "create a song that sounds like "Signaling Through the Flames" by the band the American dollar".

92. Two recording was generated by Suno AI, one in v1 the other in v2 titled "Whispers Through The Fire".

**Similarities in Between the Suno AI v1 and v2 Recordings and Copyrighted Track III**

93. The two Suno AI recordings and Copyrighted Track III have the same or highly similar: (i) rhythmic structure and temporal framework, (ii) repetitive onset spacing patterns, and structured rhythmic repetition in melodic elements, and (iii) consistent temporal framework governing repetition and phrasing as the original Copyrighted Tack.

94. Specifically, the Suno AI recordings and Copyrighted Track III have the same or similar:

- lower delayed electric piano as the foundational melodic element;
- rhythmic accents and textural events including the higher piano accents placed between measures with reversed cymbal and reverbed guitar pad used as transitional accents as well as a reverbed strings present in the opening;
- production and spatial characteristic;
- subtle reverb on electric piano and melodic layers;
- spatial depth and atmosphere;

- consistent production environment centered on reverberant electric piano textures;
- arrangement and development;
- repeated lower electric piano foundation;
- higher accent melodic layer;
- placement of accents between measures;
- increasing repetition over time, and consistent reverberant production;
- coordinated system of expressive elements;
- layering of a higher melodic piano line as the piece develops;
- subtle reverb applied to both layers;
- single tonic bass notes introduced and sustained across full measures;
- layered electric piano-based introductory structure;
- melodic construction and phrasing;
- 1/16 piano notes; and,
- 1/16 guitar notes of the middle section.

**Individual Similarities between the Suno v1 and v2 recordings and Copyrighted Track III**

95.    The Suno AI v1 recording contains the same: (i) repeating lower electric piano melody, (ii) higher piano accent layered above the lower melody, (iii) reversed cymbal and reverbed guitar pad used as accents between measures in similar placement, and (iv) increased repetition as the piece develops; the same reversed cymbal and reverbed guitar pad used as accents between measures in similar placement, leading into the start of the next measure.

96.    The Suno AI v2 recording has the same: (i) repetitive lower base melody on electric piano, (ii) higher accent piano on quarter-note timing, and (iii) progression into repetitive melodic phrasing, and (iii) higher accent piano placed rhythmically on quarter-note spacing.

97.    These similarities reflect reproduction of the original's selection, coordination, and arrangement of expressive elements.

**Other Examples**

98.     Queries were also run on the Suno AI system for twenty- nine (29) additional Copyrighted Tracks, and analyzed.  As with the above, the Suno AI music files produced parallelled each of the fundamental elements of each of the queried Copyrighted Tracks.

99.     The identical prompt was used for each Copyrighted Track and the Suno music files created from each prompt yielding the same results; namely, music files that shared the same key musical elements as the corresponding Copyrighted Track.

100.     Below is a chart of the additional Copyrighted Tracks analyzed, and the resulting musical files created by Suno AI.

| Copyrighted Track Title | Suno Music File Created | Suno Version | Analysis |
|---|---|---|---|
| 4 BC | Twilight Dreams | V1 and V2 | Highly similar key musical elements |
| Age of Wonder | Echoes of Wonder | V1 and V2 | Highly similar key musical elements |
| Anything You Synthesize | Endless Sky | V1 and V2 | Highly similar key musical elements |
| As We Float | Floating Dreams | V1 and V2 | Highly similar key musical elements |
| Atlantis | Dream of the Deep | V1 and V2 | Highly similar key musical elements |
| Bump | Catch the Wave | V1 and V2 | Highly similar key musical elements |
| Carousel | Round and Round | V1 and V2 | Highly similar key musical elements |
| Chill Kingdom | Midnight Waves | V1 and V2 | Highly similar key musical elements |
| Chillpoint Break | Moment of Flight | V1 and V2 | Highly similar key musical elements |
| DEA | Dreaming Eyes | V1 and V2 | Highly similar key musical elements |
| Everyone Gets Shot | Sunset Dreams | V1 and V2 | Highly similar key musical elements |
| Faces In The Haze | Whispers In The Wind | V1 and V2 | Highly similar key musical elements |
| Fade In Out | Fading Away | V1 and V2 | Highly similar key musical elements |

| | | | |
|---|---|---|---|
| Guided By The Glowing Sea | Night's Embrace | V1 and V2 | Highly similar key musical elements |
| Lights Dim | Whispers In The Dark | V1 and V2 | Highly similar key musical elements |
| Moms | Golden Days | V1 and V2 | Highly similar key musical elements |
| Mosaic | Shattered Dreams | V1 and V2 | Highly similar key musical elements |
| Par Avion | Floating Letters | V1 and V2 | Highly similar key musical elements |
| Rudiments of a Spiritual Life | Dream of Serenity | V1 and V2 | Highly similar key musical elements |
| Shadows | Whispers In The Night | V1 and V2 | Highly similar key musical elements |
| Signaling Through The Flames | Whispers Through The Fire | V1 and V2 | Highly similar key musical elements |
| Starscapes | Ocean Waves | V1 and V2 | Highly similar key musical elements |
| Steeltown (Ambient) | City of Steel | V1 and V2 | Highly similar key musical elements |
| The Slow Wait (Part 1) | Eternal Drift | V1 and V2 | Highly similar key musical elements |
| Thunder Rising | Echoes of Thunder | V1 and V2 | Highly similar key musical elements |
| Time | Changing Tides | V1 and V2 | Highly similar key musical elements |
| Up | Rise Above | V1 and V2 | Highly similar key musical elements |
| Wake Up Summer | Sunrise Call | V1 and V2 | Highly similar key musical elements |
| War On Christmas | Holiday Serenade | V1 and V2 | Highly similar key musical elements |
| We Hold On | Eternal Roads | V1 and V2 | Highly similar key musical elements |
| We're Hitting Everything | Reaching for the Stars | V1 and V2 | Highly similar key musical elements |
| Wudao | Echoes of Dawn | V1 and V2 | Highly similar key musical elements |
| War On Christmas | Holiday Serenade | V1 and V2 | Highly similar key musical elements |
| We Hold On | Eternal Roads | V1 and V2 | Highly similar key musical elements |
| We're Hitting Everything | Reaching for the Stars | V1 and V2 | Highly similar key musical elements |
| Wudao | Echoes of Dawn | V1 and V2 | Highly similar key musical elements |

**Conclusion**

101.    Thiry-two (32) of the Copyrighted Tracks were used in the prompt "create a song that sounds like ["COPYRIGHTED TRACK"] by the band the American dollar" in Suno AI.

102.    Every one of the Suno musical files created by each prompt shared the same, or highly similar, key musical elements; without exception.

103.    The pervasive replication of key elements in the Copyrighted Tracks by Suno AI can only be explained by defendant's ingestion of plaintiff's Copyrighted Tracks without license or authority, and in violation of plaintiff's rights as set forth in 17 U.S.C. § 106 and elsewhere.

104.    The recordings generated by Suno AI go far beyond merely mimicking the targeting Copyrighted Tracks, they co-opt the very musical architecture and design the members of plaintiff have spent decades developing.

105.    While any element present in the Suno generated recordings is not persuasive, the systemic presence of scores of elements and features in the same architectural design can only be explained by defendant's unlawful reproduction of the Copyrighted Tracks, and use of the Copyrighted Tracks to train its generative AI product.

106.    The choices made on how to layer the tracks, adjust the rhythm, what to exclude and include, etc., took plaintiff's members decades to refine.  Those decades of work have now been taken and used to train Suno's AI in violation of plaintiff's rights.

**Trade Secret Violations**

107.     Over two decades, plaintiff created, modified, and refined complex methodologies and processes for creating, and properly layering, cinematic and ambient instrumental music.

108.    Plaintiff has painstakingly guarded their methods and processes, refusing

interviews, or any type of public disclosure.

109.    Plaintiff's non-public methods and processes cannot be derived simply from listening to the Copyrighted Tracks.  As described in detail below, plaintiff's secret methods and process are not generally known and cannot be readily ascertained through proper means.

110.    Upon information and belief, defendant Suno employs a multi-stage autoregressive transformer pipeline to generate music, in which audio is built sequentially, token by token.

111.    This pipeline converts input intent into discrete audio tokens, each stage conditioning on and building upon the prior stage's output, until a complete audio reconstruction is produced.

112.    This architecture is structurally analogous to plaintiff's proprietary sequential creative process, in which each layer of a composition was built upon and conditioned on prior layers through an iterative, evaluation-driven methodology, the specifics of which constitute the trade secret at issue.

113.    Defendant ingested plaintiff's Copyrighted Tracks through improper means. Defendant's AI system then analyzed and reverse engineered the methods and processes plaintiff has protected from disclosure.  Defendant could not, in fact, have obtained plaintiff's Copyrighted Tracks through permissive.

114.    At no time did the defendant have the express or implied consent of plaintiff, and it is clear defendant was well-aware of its impermissive acts.  Upon information and belief, defendant not only was aware it was aquiring plaintiff's intellectual property by impermissive means, but calculated that the liability for its impermissive acts as part of the cost of doing business.  In other words, defendant's model was - do wrong, and if or when caught, force

-30-

lengthy litigations to mitigate damages.

**Plaintiff's Trade Secret**

115.    Traditional bands record music, generally, in a studio.   Those recordings are then manipulated in production, sounds added (or removed), and manipulated to create the final sound recording.  At times, traditional bands will record different instruments by themselves, and then layer the instruments (and vocals) over each other.

116.    That is not how plaintiff creates its Copyrighted Tracks.  Plaintiff developed, through years of trial-and-error, frequent testing, and experimentation various trade-secret methods and processes for creating its sound recordings.

117.    Plaintiff's proprietary methods and processes include the development of sequences of sound that cannot be duplicated or reverse-engineered.  Plaintiff also employs its confidential methods and processes for creating numerous complete independent layers of music, and weaving those layers together.  The way each layer of sound is engineered to integrate with the other layers, is akin to well-fitting puzzle pieces.  Any change, at any layer, has a cascade effect that requires changes in the other layers.  That is why it can take months for plaintiff to create a single Copyrighted Track.

118.    Plaintiff has gone to great lengths to protect its trade secret methods and processes from disclosure.  Plaintiff has refused all attempts to discuss its confidential methods and processes from other artists, news sources, and websites.  The proprietary unduplicatable sound sequences, and the software developed to create them, as well as the confidential layering methods and processes, are kept on a single hard drive that is not exposed to the Internet to protect them from possible external disclosure.

119.    In fact, plaintiff would not have granted Suno a license, had it sought one, because that would entail exposure to the very impermissible reverse-engineering of plaintiff's confidential processes and methods; which is exactly what happened.

120.    Plaintiff's confidential trade secrets are incredibly valuable.  As discussed above, plaintiff has employed its trade secret methods, processes, and sound sequences to create incredibly valuable sound recordings and compositions which have been licensed and used by hundreds of companies.

121.    While the end product of plaintiff's processes and methods is publicly available, the actual complex methods and processes used in creating each layer of music, overlaying the layers in a specific manner, certain proprietary sound sequences, and how each layer is engineered to fit as an integral part with the other layers is not public and/or duplicatable.   In fact, only a powerful AI system, like defendant's, is capable of reverse engineering, and employing the very confidential and proprietary methods and processes plaintiff has decades developing, reefing, and protecting from disclosure.

122.    While the members of plaintiff play each instrument used in every layer, the band "The American Dollar" rarely plays live performances because it is not possible to fully duplicate the nuanced layers of music in each of the Copyrighted Tracks in a live performance.

123.    Plaintiff is not claiming that a portion of each Copyrighted Track cannot be recreated by sound engineers and other musicians.  Instead, it is the inclusion of certain sound proprietary sequences employed in many of the Copyrighted Tracks, and the methods and processes for creating those sequences, as well as the methods and processes for creating and layering music, and the integration of those layers into a coherent and identifiable sound that cannot be reversed engineered.

124.    By ingesting plaintiff's Copyrighted Tracks into its defendant's powerful Suno AI system, defendant has ingested and co-opted plaintiff's proprietary, and confidential, methods, processes, and certain sound sequences used to create plaintiff's identifiable sound.

125.    It now takes seconds for defendant's powerful Suno AI system to deploy the very trade secret sound sequences, methods, and process plaintiff has spent decades developing and refining.

126.    Defendant not only acquired plaintiff's Copyrighted Tracks by an impermissive means, and has impermissibly reverse engineer and co-opted the very proprietary methods, processes, and sound sequences plaintiff has protected from disclosure.

127.    Defendant's entire business model is predicated on ingesting, analyzing, and incorporating the fundamental mechanics utilized in the creation of the sound records it is trained on.  Defendant has, in fact, impermissibly ingested and reverse engineered the very confidential proprietary methods and processes plaintiff has spent decades developing and protecting from disclosure.

128.     A trade secret may consist of any formula, process, device or compilation of information which is used in one's business and which provides an opportunity to obtain an advantage over competitors who do not know or use it.

129.    Defendant has violated plaintiff's rights under the Uniform Trade Secret Act

### Suno Cannot Claim Fair Use

130.    Suno has repeatedly claimed its ingestion of Plaintiff's Copyrighted Tracks, and the millions of other recordings owned by other entities, is "fair use".

131.    Suno's claim of "fair use" is itself a tacit admission of Suno's illegal copying, as "fair use" only comes into play when an unauthorized use of a copyrighted work needs to be

justified.

132.    Suno's claim of fair use, however, fails, as it does not comport to the standards of "fair use" set forth in Section 107 of the Copyright Act.

133.    The "fair use" doctrine has been coined an "equitable rule of reason" that balances various contextual factors to determine whether an unauthorized use of a copyrighted work is "fair."   Suno, however, cannot launder its conscious stealing of the Copyrighted Tracks for commercial gain with an appeal to equitable principles.  Suno understands that what it is doing is wrong and inequitable, which explains why it refused to even acknowledge the extent of its unauthorized use of Plaintiff' sound Tracks, and why it tries to cover its tracks when users publicize outputs that clearly reflect training on their Tracks.  Suno's conduct violates the very purposes of the copyright law and runs contrary to the purpose animating the fair use doctrine.

134.    The Copyright Act at Section 107 identifies examples of the types of uses that may qualify as fair, including "criticism, comment, news reporting, teaching . . . scholarship, or research."  These paradigmatic fair uses reflect the policy of ensuring public availability of "literature, music, and other arts" so that other humans can draw on those works to create new ones.  Suno's wholesale copying of countless Tracks serves none of these purposes.

135.    Suno's service does not offer "commentary" or "scholarship" or promote human authorship.  Rather, Suno's service copies and ingests copyrighted works to create computer-generated imitations of human expression that do not merit copyright protection.  Suno's motive is brazenly commercial and threatens to displace the genuine human artistry that is at the heart of copyright protection.

136.    Moreover, applying the statutory fair use factors set forth in Section 107 demonstrates that Suno's conduct fails to qualify as fair use.  These factors are: "(1) the purpose

and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

137. The first fair use factor focuses on "the problem of substitution—copyright's bête noire." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023). "The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for . . . the work," and thus is less likely to constitute "fair use".

138. Suno claims its product can produce "radio-quality music," and encourages paid users to post their outputs to "platforms expressly designed to commercialize music." In furtherance of this objective, Suno copies Plaintiff' catalogs of sound Tracks and generates digital music files that are designed to entertain, evoke emotion, and stoke passion, just like the genuine sound Tracks on which Suno was trained. Suno feeds the Copyrighted Tracks into its AI model not merely to deconstruct their expressive content, but with the explicit aim of imitating these expressive features in digital music files that could serve as substitutes for and compete with the original recordings.

139. The use here is far from transformative, as there is no functional purpose for Suno's AI model to ingest the Copyrighted Tracks other than to spit out new, competing music files. That Suno is copying the Copyrighted Tracks for a commercial purpose, and is deriving revenue directly proportional to the number of music files it generates, further tilts the first fair use factor against it. *See id.* at 532–33 ("If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to

weigh against fair use, absent some other justification for copying.").

140. The second fair use factor also favors Plaintiff. This factor recognizes that "certain 'works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'" *TCA TV Corp. v. McCollum*, 839 F.3d 168, 184 (2d Cir. 2016) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)). There is no doubt that the Copyrighted Tracks are the type of "creative expression for public dissemination [that] falls within the core of the copyright's protective purposes." *Hachette Book Grp., Inc. v. Internet Archive,* 664 F. Supp. 3d 370, 387 (S.D.N.Y. 2023) (quoting *Campbell*, 510 U.S. at 586).

141. So too does the third fair use factor weigh against fair use. "A finding of fair use is more likely when small amounts . . . are copied than when the copying is extensive, or encompasses the most important parts of the original." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015). It is abundantly clear that Suno copies (at least) the most important parts of the protected sound Tracks it sweeps into its training data, as demonstrated by its ability to recreate, for instance, some of the most recognizable musical phrases, hooks, and choruses in popular music history. Suno then uses these copies of key elements of protectable expression to generate audio outputs that resemble the Copyrighted Tracks it ingests.

142. Turning to the fourth factor, Suno's use of Copyrighted Tracks poses a significant threat to the market for and value of the Copyrighted Tracks. Licensing is at the core of plaintiff's businesses, and plaintiff license the Copyrighted Tracks for myriad purposes described above. Suno's unauthorized use of the Copyrighted Tracks not only threatens to eliminate the existing market for licensing Copyrighted Tracks, it has already devasted it.

143. Potential licensees interested in licensing copyrighted Tracks for their own

purposes could generate an AI-soundalike at virtually no cost.  This is an especially aberrant result when the replacement audio file is generated using an AI music service, like Suno's, that produced the soundalike by infringing the copyrighted recording that would otherwise have been licensed.

144.    Moreover, Suno's product has the potential to generate directly competing digital music files at such speed that it risks overrunning the market for human-made sound recordings, including the Copyrighted Tracks on which it was trained.  This competition is ramping up at a breathtaking pace.   Suno has claimed that over 100,000,000 people have already created digital music files using its service.   Suno's Terms of Service authorize the use of outputs generated on the platform by users who have subscribed to the paid tier for commercial purposes.  Users have taken this cue by publishing Suno-generated outputs on music streaming services, where they will compete for plays against real, copyrighted sound recordings.

145.    Enticed by the prospect of exponential growth, Suno continues to circumvent the ordinary rules and steal vast amounts of copyrighted Tracks to train its AI model.  Suno's efforts are "directly aimed at replacing the work of human artists with massive quantities of AI-created 'sounds' . . . that substantially dilute the royalty pools that are paid out to artists."[8]

146.    The harm Suno is causing goes far beyond these immediate economic consequences.  Suno's wholesale theft of the Copyrighted Tracks threatens the entire music ecosystem and the numerous people it employs.  It also degrades the rights of artists to control their works, determine whether future uses of their works align with their aesthetic and personal values, and decide the products or services with which they wish to be associated.  It also propagates the destructive theory that copyrighted music is free for the taking whenever a new

---

[8] Artist Rights Alliance, 200+ Artists Urge Tech Platforms: Stop Devaluing Music, Medium (Apr. 1, 2024),

technology claims that seeking and obtaining permission is just too cumbersome. In other words, Suno's conduct is a frontal attack on the very purpose of copyright law to reward authors and promote their incentives to continue creating copyrighted works.

147. There is room for AI and human creators to forge a sustainable, complementary relationship that promotes human creativity and facilitates the human creations that shape culture, excite the public, and resonate with consumers. This can and should be achieved through the well-established mechanism of free-market licensing that ensures proper respect for copyright owners. Like the other AI technologies that have struck licensing deals with copyright owners, copyright law mandates that Suno do the same if it wishes to build a business using the Copyrighted Tracks.

148. Since the day it launched, Suno has flouted the rights of copyright owners in the music industry as part of a mad dash to become the dominant AI music generation service. Neither Suno, nor any other generative AI company, can be allowed to advance toward this goal by trampling the rights of copyright owners like Plaintiff.

149. Plaintiff is the most vulnerable group that has been prayed on by defendant. Unlike other matters filed against Defendant, plaintiff is comprised of two independent musicians who have made a living from the revenue generated from their Copyrighted Tracks. A living that has now been completely undermined by defendant. Worst of all, defendant utilized plaintiff's decades of work to destroy the very market plaintiff has developed. Plaintiff is composed of two, of thousands, independent musicians who have been crushed by defendant's blatant acts of copyright infringement.

**FIRST CLAIM FOR RELIEF**
**COPYRIGHT INFRINGEMENT**

150. Plaintiff incorporates the allegations contained in the preceding paragraphs as if set

forth here at length here.

151.   It cannot be disputed that plaintiff has valid, registered copyrights, and owns all rights to the Copyrighted Tracks.

152.   Suno has knowingly infringed plaintiff's exclusive rights to the Copyrighted Tracks by reproducing them in violation of 17 U.S.C. § 106(1).

153.   At no time did Suno have authorization, permission, license, or consent to reproduce or otherwise use the Copyrighted Tracks.

154.   Upon information and belief, Suno used the reproductions of the Copyrighted Tracks to train its generative AI model.

155.   Each of Suno's acts of infringement of the Copyrighted Tracks is a willful violation of 17 U.S.C. § 106.

156.   As a direct and proximate result of Suno's infringement of plaintiff's exclusive rights, Suno has caused and will continue to cause irreparable injury to plaintiff for which plaintiff has no adequate remedy at law.  Plaintiff is therefore entitled to injunctive relief and to either actual damages and Suno's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with plaintiff's costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## SECOND CAUSE OF ACTION
### Violation of the Uniform Trade Secret Act
### N.Y. CLS Labor Law § 201-e

157.   Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

158.   Plaintiff has spent decades defining and developing methods and processes to create its music which have been utilized on a continuous basis in the operation of the business.

159.   Plaintiff's confidential and proprietary methods and processes are not known to

anyone outside of plaintiff.

160.    No employee, collaborator, musician, or external party has ever been made privy to plaintiff's confidential and proprietary methods and processes.

161.    Plaintiff has guarded the secrecy of confidential and proprietary methods and processes.

162.    Plaintiff's confidential and proprietary methods and processes, employed in the creation of its music and unique sound sequences, are incredibly valuable.  They are fundamental to the creation of plaintiff's Copyrighted Tracks, which have generated significant revenue.

163.    The unique sound sequences, which cannot be reversed engineered, have been stolen, and used by others on hundreds, probably thousands of occasions.

164.    One unique sound sequence in the Copyrighted Track "Anything You Synthesize" has been used by at least ten (10) other musicians in the songs because the sound sequence cannot be reverse engineered, but must be copied directly from the Copyrighted Track.

165.    Plaintiff's confidential and proprietary methods and processes, if known by others, could be used to re-create the core aspects of plaintiff's business.

166.    Plaintiff has expended decades, at significant expense, creating, modifying, and refining its confidential proprietary methods and processes.

167.    Defendant acquired plaintiff's Copyrighted Tracks through improper means.

168.    It would be nearly impossible to impossible to replicate the plaintiff's confidential and proprietary methods and processes through normal means.

169.    In fact, only a powerful AI system, like defendant's, is capable of reverse-engineering plaintiff's confidential and proprietary methods and processes.  Defendant, like other AI companies, would not have been able to obtain the rights to the Copyrighted Tracks by

permissible means.

170.    Defendant, through its powerful Suno AI product, was able to analyze the Copyrighted Tracks and create new music files based on plaintiff's confidential and proprietary methods and processes, and the sound sequences they produce.

171.    Defendant is, and was, able to impermissibly co-opt the decades of time, and significant costs, expended by plaintiff in the creation of its confidential methods and processes.

172.    Defendant has violated plaintiff's rights pursuant to the Uniform Trade Secret Act, and plaintiff is entitled its actual loss, defendant's unjust enrichment, and/or reasonable royalty. Plaintiff is also entitled to the reasonable costs and attorney's fees incurred in this action.

**THIRD CAUSE OF ACTION**
**TRADE SECRET VIOLATION**
**Protect Trade Secret Act**
**18 U.S.C. § 1836**

173.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

174.    Plaintiff's confidential and proprietary methods and processes are employed to create songs that have been streamed and licensed nationally interstate and internationally.

175.    Defendant acquired plaintiff's confidential and proprietary methods and process by reverse-engineering the Copyrighted Tracks which were acquired by impermissive means.

176.    Defendant's acts violate plaintiff's rights pursuant to the Protect Trade Secrets Act.

177.     Plaintiff is entitled its actual loss, defendant's unjust enrichment, and/or reasonable royalty. Plaintiff is also entitled to the reasonable costs and attorney's fees incurred in this action.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment against defendant, and awarding plaintiff as follows:

1. For a declaration that Suno has willfully infringed plaintiff's Copyrighted Tracks.

2. For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of plaintiff's protected Copyrighted Tracks, including a preliminary and permanent injunction requiring that Suno and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of plaintiff's exclusive rights under federal law, including without limitation in the sound recordings identified in Exhibit A;

3. For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Suno's willful violations of plaintiff's rights, including in an amount up to $150,000 per work infringed; or, in the alternative, at plaintiff's election, plaintiff's actual damages and/or Suno's profits from infringement pursuant to 17 U.S.C. § 504(b), in an amount to be proven at trial;

4. Reasonable attorneys' fees and costs (17 U.S.C. § 505);

5. Plaintiff's actual loss, defendant's unjust enrichment, and/or a reasonable royalty for defendant's violation of the Uniform Trade Secret Act;

6. Plaintiff's reasonable costs and attorney's fees incurred in this action under the Uniform Trade Secret Act;

7.  Plaintiff's actual loss, defendant's unjust enrichment, and/or a reasonable royalty for defendant's violation of the Protect Trade Secrets Act;

8.  Plaintiff's reasonable costs and attorney's fees incurred in this action under the Protect Trade Secrets Act.

9.  Pre- and post-judgment interest to the extent allowable; and,

10. Such other and further relief that the Court may deem just and proper.

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: June 2, 2026                                  **GARBARINI FITZGERALD P.C.**
        New York, New York

                                                     By: _Richard M. Garbarini_____
                                                         Richard M. Garbarini (RG 5496)